IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case Number: _____

CONSOLIDATED ELECTRICAL )
DISTRIBUTORS, INC., )
)
      Plaintiff, )
)
v. )
)    **COMPLAINT**
HALLMARK LIGHTING, LLC; )
RESILIENCE CAPITAL PARTNERS, )
LLC, )
)
      Defendants. )

I.

Consolidated Electrical Distributors, Inc., the use plaintiff herein (hereinafter known as "Plaintiff"), is a corporation organized and existing under the laws of the State of Delaware, which maintains a place of business in Mecklenburg County, North Carolina. Plaintiff is engaged in the business of selling electrical materials for the construction and improvement of real property.

II.

Defendant Hallmark Lighting, LLC (hereinafter known as "Hallmark") is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware which maintained its principal place of business in Los Angeles County, California. Upon information and belief, Defendant Hallmark is an electrical fixtures supplier and manufacturer.

III.

Defendant Resilience Capital Partners, LLC (hereinafter known as "Resilience") is a limited liability company organized and existing under and by virtue of the laws of the State of Ohio which maintains its principal place of business in Franklin County, Ohio. Upon information and belief,

1

Defendant Resilience is a private equity firm and holds, or held at times relevant to this matter, membership interest in Defendant Hallmark.

IV.

The Court has jurisdiction over the subject matter of this action pursuant to 28. U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between the Plaintiff and Defendant Hallmark and Defendant Resilience.

V.

Venue is proper in the Western District of North Carolina, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims at issue occurred in this district.

## FACTUAL ALLEGATIONS

VI.

Upon information and belief, Articles of Organization were filed for Defendant Resilience (then known as "Resurgence Capital Partners, LLC") on June 8, 2001 with the Ohio Secretary of State.

VII.

Upon information and belief, Defendant Resilience began its operations as a private equity firm, investing in manufacturing and business services companies.

VIII.

Upon information and belief, Articles of Organization were filed for Defendant Hallmark on December 5, 2007 with the Delaware Secretary of State.

IX.

Upon information and belief, in October of 2016 Defendant Resilience acquired a portfolio of businesses which included ownership interest of Defendant Hallmark.

2

X.

Upon information and belief, Defendant Resilience, following the acquisition of Defendant Hallmark, held exclusive control and domination over Defendant Hallmark.

XI.

Upon information and belief, following the acquisition of Defendant Hallmark by Defendant Resilience, Defendant Resilience had control over the policy and business practices of Defendant Hallmark.

XII.

In 2018, Plaintiff entered into a subcontract agreement with Watson Electrical Construction Co. LLC (hereinafter known as "Watson") related to a construction project known as "Willowbrooke Court at Plantation Estates" located in Charlotte, Mecklenburg County, North Carolina (hereinafter known as the "Project").

XIII.

Upon information and belief, Watson served as a first tier electrical subcontractor on the Project, having entered into a contract with the general contractor, Edifice LLC (hereinafter known as "Edifice").

XIV.

Pursuant to the subcontract agreement between Plaintiff and Watson, Plaintiff was to procure and furnish custom electrical fixtures and related materials to be incorporated into the Project.

XV.

In September, 2018, Plaintiff disseminated Watsons' custom electrical fixture needs to Plaintiff's industry contacts, including certain lighting representatives and manufacturers, for the purpose of

3

procuring the necessary fixtures and related materials for the Project. Plaintiff's September, 2018 dissemination did not include Defendant Hallmark.

XVI.

Upon information and belief, in October, 2018, Defendant Hallmark, as a custom electrical fixture manufacturer and supplier, and without knowledge of Plaintiff, provided a production quote for the Project directly to the electrical engineer for the Project, Devita & Associates, Inc. (hereinafter known as "Devita"), designed to fulfil and satisfy Watson's electrical fixture needs for the Project.

XVII.

Upon information and belief, Defendant Hallmark's electrical fixtures are manufactured in China.

XVIII.

In February of 2019, Plaintiff submitted its original materials submittals to Devita for review and approval, which did not include fixtures to be supplied by Defendant Hallmark.

XIX.

In April, 2019, Devita rejected Plaintiff's original submittals for the custom electrical fixtures.

XX.

In May, 2019, Plaintiff was directed by Devita to utilize Defendant Hallmark as the supplier and manufacturer for the custom electrical fixtures and that Plaintiff was directed to place a purchase order with Defendant Hallmark by the end of May, 2019 in order to lock-in pricing for the electrical fixtures.

XXI.

On or about May 29, 2019, Defendant Hallmark sent a revised fixture quote directly to Devita.

4

## XXII.

On or about May 29, 2019, Devita forwarded Defendant Hallmark's fixture quote to Plaintiff, for the purpose of directing Plaintiff to purchase the electrical fixtures from Defendant Hallmark.

## XXIII.

On or about May 31, 2019, pursuant to the directive of Devita, Plaintiff issued a purchase order to Defendant Hallmark for the purpose of purchasing the electrical fixtures necessary for the Project.

## XXIV.

Subsequently on May 31, 2019, Plaintiff received confirmation of the purchase order from Defendant Hallmark and was advised that a fifty percent (50%) deposit is necessary for production. Namely, the sum of Seventy Seven Thousand Three Hundred Seventeen and 38/100 Dollars ($77,317.38).

## XXV.

On or about June 5, 2019, Plaintiff tendered an initial deposit in the amount of Seventy Seven Thousand Three Hundred Seventeen and 38/100 Dollars ($77,317.38) to Defendant Hallmark for the custom electrical fixtures.

## XXVI.

Thereafter, and pursuant to Plaintiff's subcontract with Watson, Plaintiff submitted its invoice to Watson accordingly, and received payment from Watson.

## XXVII.

Despite a purchase order having been issued by Plaintiff and accepted by Defendant Hallmark, beginning in June, 2019 and continuing through the end of October 2019, Defendant Hallmark continued to send requests for information to Devita and Plaintiff related to changes to the fixtures

to be manufactured and supplied by Defendant Hallmark to Plaintiff, delaying the production of the custom electrical fixtures.

XXVIII.

Upon information and belief, by the end of October, 2019 Defendant Resilience had begun seeking to sell the assets of Defendant Hallmark.

XXIX.

On or about October 31, 2019, Defendant Hallmark was directed to release for production those portions of the electrical fixture order that had been approved, for manufacture.

XXX.

On or about November 4, 2019, Defendant Hallmark was again directed to proceed with the manufacturer of all fixtures which had been approved, to date, which had been continually delayed by Defendant Hallmark.

XXXI.

By November 8, 2019, the remainder of the fixture order was approved for manufacture and Defendant Hallmark received directive to proceed accordingly.

XXXII.

On November 15, 2019, Defendant Hallmark confirmed an anticipated shipping date of the electrical fixtures and related materials from Defendant Hallmark's California facility by March 23, 2020.

XXXIII.

On or about November 15, 2019, Plaintiff remitted the balance of Eighty Nine Thousand Two Hundred Ninety Five and 60/100 Dollars ($89,295.60) to Defendant Hallmark, representing payment in full for the custom electrical fixtures.

6

## XXXIV.

Thereafter, and pursuant to Plaintiff's subcontract with Watson, Plaintiff submits its invoice to Watson accordingly, and received payment from Watson.

## XXXV.

As of November 15, 2019, Plaintiff had remitted to Defendant Hallmark no less than One Hundred Sixty Six Thousand Six Hundred Twelve and 98/100 Dollars ($166,612.98).

## XXXVI.

On December 13, 2019, Defendant Hallmark again delayed the provision of the custom electrical fixtures, for which payment had already been made. The revised shipping date became April 13, 2020.

## XXXVII.

On December 18, 2019, Plaintiff requested that Defendant Hallmark expedite the shipping of the custom electrical fixtures and related materials, so as to avoid further delay to the Project.

## XXXVIII.

On January 3, 2020, Defendant Hallmark advised Plaintiff that expedited shipping was not possible and provided an April 13, 2020 ship date.

## XXXIX.

Thereafter, Defendant Hallmark offered to have the materials flown to the Project location, for an additional advanced cost, in order to speed up delivery by approximately two (2) weeks.

## XL.

On or about January 13, 2020, Devita requested pricing for expediting shipping.

## XLI.

On or about January 21, 2020 Plaintiff approved "air freight" in order to expedite the electrical fixtures to the Project, as directed by Devita, believing that Defendant Hallmark still intended to fulfill Plaintiff's custom electrical fixture order.

## XLII.

On or about February 10, 2020, Defendant Hallmark notified Plaintiff of additional "delays" in shipping.

## XLIII.

On or about February 11, 2020, Defendant Hallmark represented to Plaintiff that a partial shipment of the fixtures had arrived in Defendant Hallmark's California facility. Despite this representation to Plaintiff by Defendant Hallmark, it is believed that the represented fixtures had not arrived in Defendant Hallmark's California facility.

## XLIV.

On or about February 19, 2020, Defendant Hallmark represented to Plaintiff that, instead, the fixtures had been "held up at port". Upon information and belief, despite these representations to Plaintiff by Defendant Hallmark, no fixtures had been "held up at port".

## XLV.

On or about February 20, 2020, Defendant Hallmark furnished to Plaintiff an invoice in the amount of Fourteen Thousand Seven Hundred Fifty Four and 33/100 Dollars ($14,754.33) purportedly for expedited shipping and advised Plaintiff that Defendant Hallmark would not ship the materials until the shipping invoice had been remitted.

## XLVI.

On February 27, 2020, Plaintiff remitted the sum of Fourteen Thousand Seven Hundred Fifty Four and 33/100 Dollars ($14,754.33) to Defendant Hallmark for the expedited shipping.

## XLVII.

Thereafter, and pursuant to Plaintiff's subcontract with Watson, Plaintiff submits its invoice to Watson accordingly, and received payment from Watson.

## XLVIII.

By March 1, 2020, Plaintiff had remitted no less than the sum of One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31) to Defendant Hallmark for the custom electrical fixtures and additional shipping costs.

## XLIX.

Despite receipt of payment, in full, for the custom electrical fixtures and expedited shipping, Defendant Hallmark was so inadequately capitalized by Defendant Resilience that Defendant Hallmark had no wherewithal to actually fulfill the order in its entirety.

## L.

By March, 2020, certain electrical fixtures began to appear at the Project with shipping labels. However, it was immediately noted by Edifice, Watson, and Plaintiff that the limited shipments that had arrived were incomplete and mislabeled.

## LI.

The shipping labels created by Defendant Hallmark misrepresented the electrical fixtures contained in the limited shipments received at the end of February, 2020 and beginning of March, 2020.

9

## LII.

On March 2, 2020 Plaintiff notified Defendant Hallmark that the partial shipment received was incomplete and incorrect.

## LIII.

On March 3, 2020, Plaintiff again notified Defendant Hallmark that the partial shipment received was incomplete and incorrect.

## LIV.

Meanwhile, upon information and belief, Defendant Resilience as owner of Defendant Hallmark, continued to secretly shop for potential buyers to purchase the assets of Defendant Hallmark and subsequently close down Defendant Hallmark.

## LV.

Upon information and belief, on or about March 20, 2020, Defendant Hallmark terminated its employees in concert with Defendant Resilience having identified a potential purchaser for Defendant Hallmark's assets.

## LVI.

On or about March 23, 2020, only thirty two (32) days after Defendant Hallmark had demanded Plaintiff tendered an additional sum for expedited shipping, Defendant Hallmark represented to Plaintiff that Defendant Hallmark was ceasing its operations but would be communicating Defendant Hallmark's plans for "resolution" of all outstanding orders as soon as possible.

## LVII.

Upon information and belief, neither Defendant Hallmark nor Defendant Resilience had any intention to fulfill Plaintiff's order.

## LVIII.

On March 24, 2020, Plaintiff demanded a refund of all the sums remitted for the custom electrical fixtures.

## LIX.

Upon information and belief, Defendant Resilience, as the owner of Defendant Hallmark, had siphoned the funds paid by Plaintiff to Defendant Hallmark.

## LX.

Plaintiff's request for a refund for the sums for the custom electrical fixtures was rejected.

## LXI.

Upon information and belief, and without notice or consultation with Plaintiff, Defendant Hallmark and\or Defendant Resilience cancelled Plaintiff's order of electrical fixtures with its manufacturers, despite having received payment in advance. Or, conversely, the complete order of electrical fixtures was never placed for manufacture.

## LXII.

On March 26, 2020, Defendant Hallmark advised Plaintiff's outside lighting representative that Plaintiff's electrical fixtures were in Defendant Hallmark's California warehouse facility. However, despite those representations, Plaintiff's electric fixtures were not in Defendant Hallmark's warehouse facility.

## LXIII.

On April 2, 2020, Defendant Hallmark again assured Plaintiff that the electrical fixtures would be received.

11

LXIV.

On April 9, 2020 Plaintiff's outside lighting representative contacted Defendant Resilience to determine status of Plaintiff's custom electrical fixture order.

LXV.

On April 14, 2020, Plaintiff requested an update from Defendant Hallmark. Defendant Hallmark forwarded Plaintiff's inquiry to Defendant Resilience, Defendant Hallmark's parent company, illustrating Defendant Resilience's control over Defendant Hallmark as well as its transactions and policies relevant to this action.

LXVI.

On April 16, 2020, Defendant Resilience's agent (with copy to Defendant Resilience) stated that Plaintiff's order will be filled, illustrating Defendant Resilience's control over Defendant Hallmark as well as the transactions and policies relevant to this action.

LXVII.

Meanwhile, Defendant Resilience continued to finalize an asset sale of Defendant Hallmark.

LXVIII.

Upon information and belief, Defendant Resilience intended to sell the assets of Defendant Hallmark, close down Defendant Hallmark, reap the economic benefit of all funds received for orders not filled (including Plaintiff's), with no intentions of fulfill the outstanding orders of Defendant Hallmark.

LXIX.

On April 22, 2020, Plaintiff contacted Defendant Resilience's agent about the status of the order as well as the expedited shipping costs.

12

LXX.

On May 7, 2020, Plaintiff sought confirmation of a May 18, 2020 shipping date for the electrical fixtures. In response, on May 8, 2020, Defendant Hallmark directed Plaintiff's independent lighting representative to Defendant Resilience's agent.

LXXI.

On or about May 19, 2020, an asset sale of Defendant Hallmark closed, whereby the assets of Defendant Hallmark were sold to a third-party entity known as "Hallmark Hospitality, LLC". Neither Defendant Hallmark nor Defendant Resilience made Plaintiff aware of the sale the asset sale at that time.

LXXII.

On May 20, 2020, Plaintiff's independent lighting representative contacted Defendant Resilience's agent regarding status of Plaintiff's order.

LXXIII.

On May 21, 2020, Plaintiff's independent lighting representative is contacted by Defendant Resilience's agent, advising Plaintiff's independent lighting representative: "we have sold Hallmark Lighting". Plaintiff is directed by Defendant Resilience's agent to contact the purchaser of Defendant Hallmark's assets, illustrating that Defendant Hallmark had no independent autonomy from Defendant Resilience and that Defendant Resilience exercised control over Defendant Hallmark's operations related to Plaintiff's order.

LXXIV.

Upon information and belief, Defendant Resilience, as the owner of Defendant Hallmark, realized the economic gain from Defendant Hallmark's asset sale as well as the economic gain from all sums paid by Plaintiff.

## LXXV.

On or about June 6, 2020, and despite having remitted the sum of One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31), and not having received the custom electrical fixtures, Devita directed Plaintiff to find replacement materials for the Project.

## LXXVI.

On July 6, 2020, despite having made repeated promises of delivery in exchange for the previously received payment, Defendant Resilience's agent advises that they "no longer" own Defendant Hallmark, which is now defunct, and are of no further assistance.

## LXXVII.

Defendant Resilience, through its exercise and dominion over Defendant Hallmark, was able to reap the economic benefit of Defendant Hallmark's accounts receivables, specifically including Plaintiff's advance payments for the custom electronic fixtures and expedited shipping, without actually capitalizing Defendant Hallmark, leaving Defendant Hallmark unable to fill Plaintiff's order, despite having received payment in advance.

## LXXVIII.

By requiring that Plaintiff remit payment in advance for the custom electrical fixtures and the expedited shipping, Defendant Resilience, through its control over Defendant Hallmark, was able to collect sums paid to Defendant Hallmark, defraud Defendant Hallmark's customers (including Plaintiff), and then, through its covert asset sale, reduce Defendant Hallmark to an empty husk.

## LXXIX.

Defendant Resilience, with actual knowledge of its covert intention to conduct an asset sale of Defendant Hallmark and not honor the outstanding orders (including Plaintiff's), continued to promise performance on behalf of Defendant Hallmark, to the detriment of Plaintiff.

## LXXX.

As a direct result of Defendant Hallmark and Defendant Resilience having failed to furnish the necessary custom electrical fixtures to Plaintiff, thereby leading to Plaintiff's inability to furnish the necessary custom electrical fixtures to Watson and the Project, Plaintiff was forced to issue credit to Watson in the amount of One Hundred Forty Thousand and 00/100 Dollars ($140,000.00), representing a return of the payments previously received from Watson so that Watson could obtain cover electric fixtures.

## LXXXI.

Upon information and belief, Defendant Resilience, both directly and through its control over Defendant Hallmark, was successful in: 1) receiving more than One Hundred Eight Thousand Dollars ($181,000.00) from Plaintiff, 2) misleading Plaintiff about Defendant Hallmark's intentions and abilities to fulfil Plaintiff's custom electrical fixture order, 3) selling the remaining assets of Defendant Hallmark (which, upon information and belief, were inflated as a result of collecting advanced payments and not fulfilling orders), 4) procuring the economic benefit of the unfilled orders as the then owner of Defendant Hallmark, by retaining the funds paid by Defendant Hallmark's customers, including Plaintiff, and 5) closing down Defendant Hallmark in an attempt to shield potential liability.

## COUNT ONE
## BREACH OF CONTRACT

### LXXXII.

Plaintiff readopts the preceding paragraphs of this complete and further sets forth the following:

### LXXXIII.

Plaintiff and Defendant Hallmark entered into a contractual agreement for Defendant Hallmark to manufacture and supply Plaintiff with custom electrical fixtures. The contractual agreement was codified in a purchase order from and subsequent invoice.

### LXXXIV.

Pursuant to the purchase order and subsequent invoice, Plaintiff remitted to Defendant Hallmark the total sum of One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31).

### LXXXV.

Despite payment, in full, for the custom electrical fixtures, Defendant Hallmark failed and refused to fill the entire custom electrical fixture order.

### LXXXVI.

Due to Defendant Hallmark's failure to fill the entire custom electrical fixture order, Plaintiff was forced to issue credit to Watson in the amount of One Hundred Forty Thousand and 00/100 Dollars ($140,000.00), representing a return of the payments previously received from Watson so that Watson could obtain cover electric fixtures.

### LXXXVII.

Despite actual knowledge that Defendant Hallmark had no intention to fulfill Plaintiff's purchase order, Defendant Hallmark continued to represent to Plaintiff that Defendant Hallmark would be filling the entire purchase order and continued to request the advancement of additional sums.

LXXXVIII.

Defendant Hallmark has thus breached its contract with Plaintiff.

LXXXIX.

As a direct result of Defendant Hallmark's breach of its contract with Plaintiff, Plaintiff has incurred the following monetary damages in the sum of at least One Hundred Forty Thousand and 00/100 Dollars ($140,000.00).

XC.

Plaintiff has complied with all conditions precedent and is entitled to receipt of payment from Defendant Hallmark for the electrical goods, materials, and supplies furnished by Plaintiff.

**COUNT TWO**
**QUANTUM MERUIT**
**(In the Alternative to Count One)**

XCI.

Plaintiff readopts the preceding paragraphs of this complaint and further sets forth the following:

XCII.

Plaintiff requested that Defendant Hallmark procure and furnish certain custom electrical fixtures for the benefit of Plaintiff, Watson, Edifice and the Project.

XCIII.

Accordingly, Plaintiff tendered no less than One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31) to Defendant Hallmark and, indirectly, to Defendant Resilience.

XCIV.

At the time Plaintiff tendered the aforementioned sum, Defendant Hallmark was owned by Defendant Resilience.

17

## XCV.

Only a portion of the custom electrical fixtures were ever furnished to Plaintiff, Watson, Edifice and the Project.

## XCVI.

Following receipt of payments from Plaintiff totaling One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31), Defendant Resilience sold off the remaining assets of Defendant Hallmark for an economic gain.

## XCVII.

Concurrently, Defendant Hallmark and Defendant Resilience made representations to Plaintiff that Plaintiff would be receiving the custom electrical fixtures, despite Defendant Resilience's actual knowledge that the order would not be completely filled.

## XCVIII.

The funds that were tendered by Plaintiff for the custom electrical fixtures to Defendant Hallmark were directed to Defendant Resilience, as the owner of Defendant Hallmark.

## XCIX.

Having not furnished the custom electrical fixtures, Defendant Resilience has been unjustly enriched in excess of Seventy Five Thousand and 00/100 Dollars ($75,000.00).

**COUNT THREE**
**FRAUD IN THE INDUCEMENT \ UNFAIR AND DECEPTIVE TRADE PRACTICES**

## C.

Plaintiff readopts the preceding paragraphs of this complaint and further sets for the following:

## CI.

Plaintiff justifiably relied on Defendant Hallmark to perform its contractual duties and to furnish the custom electrical fixtures.

18

## CII.

Defendant Hallmark made repeated representations to Plaintiff during the course of the relationship that Defendant Hallmark would perform its contractual duties, thereby inducing Plaintiff to continue to remit payments to Defendant Hallmark.

## CIII.

In fact, Defendant Hallmark induced Plaintiff to remit payments above and beyond the sum due for the custom electrical fixtures for purported "expedited shipping".

## CIV.

The representations made by Defendant Hallmark were false and concealed Defendant Hallmark's actual inabilities and intentions as they related to Plaintiff's custom electrical fixture order.

## CV.

In fact, Defendant Hallmark had neither the intention nor the ability to actually furnish the custom electrical fixtures.

## CVI.

Defendant Hallmark knew, at the time the representations were made to Plaintiff, that the representations regarding the furnishing of custom electrical fixtures were false and misleading.

## CVII.

Defendant Hallmark acted in a manner which had the capacity or tendency to deceive and acted unfairly, with the intent to deceive Plaintiff.

## CVIII.

Defendant Hallmark's actions deceived Plaintiff and are the proximate cause of the damage incurred by Plaintiff.

19

## CIX.

Plaintiff's justifiable reliance was to the detriment of Plaintiff and resulted in monetary damage to Plaintiff.

## CX.

Defendant Hallmark's actions illustrate that Defendant Hallmark's intentions were to entice Plaintiff into the purchase order with Defendant Hallmark, for Plaintiff to remit payment in full for the same, for Plaintiff to remit additional sums for expedited shipping, all the while having no intention of fulfilling the custom electrical fixture order.

## CXI.

Defendant Hallmark's actions, as set forth in this Complaint, had the tendency to deceive and defraud Plaintiff and did, in fact, deceive and defraud Plaintiff to Plaintiff's detriment.

## CXII.

Defendant Hallmark's actions, inactions, and conduct (as set forth in this Complaint) were in or affecting commerce in the State of North Carolina and constitute unfair and deceptive trade practices, in violation of N.C.G.S. § 75.

## CXIII.

Defendant Hallmark's action of fraudulently inducing Plaintiff to enter into the purchase order, resulting in monetary damage to Plaintiff, constitute a violation of N.C.G.S. § 75.

## CXIV.

Defendant Hallmark and Defendant Resilience, by receiving no less than One Hundred Eight One Thousand Three Hundred Sixty Seven and 31/100 Dollars ($181,367.31), have benefited from their own fraud.

The frauds perpetrated directly and proximately caused Plaintiff monetary damage in an amount in excess of Seventy Five Thousand and 00/100 Dollars ($75,000.00), the exact amount of which will be proved at trial.

CXVI.

Pursuant to N.C.G.S. § 75, Plaintiff is entitled to have its damages trebled and to recover reasonable attorneys' fees and the costs of this action.

**COUNT FOUR**
**CONVERSION**

CXVII.

Plaintiff readopts the preceding paragraphs of this complaint and further sets forth the following:

CXVIII.

Plaintiff was to receive certain custom electrical fixtures in exchange for payment.

CXIX.

Defendant Hallmark and Defendant Resilience, by and through their concealment and\or misrepresentations, have come into possession of certain monetary assets of Plaintiff and have deprived Plaintiff from certain monetary assets to which it is entitled.

CXX.

Defendant Hallmark and Defendant Resilience, through their wrongful deprivation, have converted certain assets of Plaintiff.

CXXI.

The wrongful deprivation by Defendant Hallmark and Defendant Resilience has resulted in actual damage to Plaintiff in excess of Seventy Five Thousand and 00/100 Dollars ($75,000.00), the exact amount of which will be proved at trial.

## COUNT FIVE
## DISREGARD OF CORPROATE ENTITY\PIERCING THE CORPORATE VEIL

### CXXII.

Plaintiff readopts the preceding paragraphs of this complaint and further sets forth the following:

### CXXIII.

Defendant Resilience is directly liable for the actions of Defendant Hallmark, as Plaintiff is entitled to pierce the corporate veil of that entity.

### CXXIV.

Upon information and belief, Defendant Hallmark was a mere instrumentality of Defendant Resilience, who exercised complete domination and control over the finances and policy of Defendant Hallmark.

### CXXV.

Defendant Resilience used its control over Defendant Hallmark to commit a wrong against Plaintiff by failing to adequately capitalize Defendant Hallmark in order to realize economic gain through the receipt of advanced payments paid by Plaintiff while simultaneously seeking to sell the assets of Defendant Hallmark and not fulfil the outstanding orders, including that of Plaintiff.

### CXXVI.

Defendant Resilience failed to adequately capitalize Defendant Hallmark, leaving Defendant Hallmark without the ways or means to fulfil the outstanding orders, including that of Plaintiff.

### CXXVII.

Defendant Hallmark repeatedly referred Plaintiff to Defendant Resilience and its agents, illustrating that Defendant Hallmark had no independent identity or authority. Instead, Defendant Hallmark was controlled by Defendant Resilience, who had rendered Defendant Hallmark insolvent.

CXXVIII.

Upon information and belief, certain agents and\or employees of Defendant Resilience were actually functioning and performing the duties of their respective offices for Defendant Hallmark.

CXXIX.

Defendant Resilience's control and domination over Defendant Hallmark, which left Defendant Hallmark insolvent, inadequately capitalized, and without the ways and means to fulfil Plaintiff's custom electrical fixture order was in violation of Plaintiff's legal rights.

CXXX.

Defendant Resilience's control and domination over Defendant Hallmark, which left Defendant Hallmark insolvent, inadequately capitalized, and without the ways and means to fulfil Plaintiff's custom electrical fixture order was the proximate cause of Plaintiff's monetary damages in the sum of at least One Hundred Forty Thousand and 00/100 Dollars ($140,000.00).

**WHEREFORE, PLAINTIFF PRAYS THIS HONORABLE COURT
FOR THE FOLLOWING RELIEF**

I.

WHEREFORE, pursuant to Count One of the Complaint, Plaintiff Consolidated Electrical Distributors, Inc. claims of Defendant Hallmark Lighting, LLC, and shall be awarded judgment in the sum of One Hundred Forty Thousand and 00/100 Dollars ($140,000.00), plus interest at the legal rate of 8% per annum until paid in full, reasonable attorneys' fees as allowed by law, and the costs of this action, over and above all credits, setoffs, payments, or counterclaims.

II.

WHEREFORE, in the alternative and pursuant to Count Two of the Complaint, Plaintiff Consolidated Electrical Distributors, Inc. claims of Defendant Hallmark Lighting, LLC and Defendant Resilience Capital Partners, LLC, and shall be awarded judgment, in the sum of One

23

Hundred Forty Thousand and 00/100 Dollars ($140,000.00), plus interest at the legal rate of 8% per annum until paid in full and the costs of this action, over and above all credits, setoffs, payments, or counterclaims.

III.

WHEREFORE, pursuant to Count Three of the Complaint, Plaintiff Consolidated Electrical Distributors, Inc. claims of Defendant Hallmark Lighting, LLC, and shall be awarded judgment in a sum in excess of Seventy Five and 00/100 Dollars ($75,000.00), the precise amount of which is to be proven at trial, plus interest at the legal rate of 8% per annum until paid in full, reasonable attorneys' fees as allowed by law, and the costs of this action, over and above all credits, setoffs, payments, or counterclaims and that those damages be trebled pursuant to N.C.G.S. § 75.

IV.

WHEREFORE, pursuant to Count Four of the Complaint, Plaintiff Consolidated Electrical Distributors, Inc. claims of Defendant Hallmark Lighting, LLC and Defendant Resilience Capital Partners, LLC, and shall be awarded judgment in excess of Seventy Five and 00/100 Dollars ($75,000.00), the precise amount of which is to be proven at trial, plus interest at the legal rate of 8% per annum until paid in full, reasonable attorneys' fees as allowed by law, and the costs of this action, over and above all credits, setoffs, payments, or counterclaims.

V.

WHEREFORE, pursuant to Count Five of the Complaint, that Defendant Resilience Capital Partners, LLC is directly liable for the actions of Defendant Hallmark Lighting, LLC, and that Plaintiff shall be awarded judgment against Defendant Resilience Capital Partners, LLC in excess of Seventy Five and 00/100 Dollars ($75,000.00), the precise amount of which is to be proven at trial, plus interest at the legal rate of 8% per annum until paid in full, reasonable attorneys' fees as

allowed by law, and the costs of this action, over and above all credits, setoffs, payments, or counterclaims.

VI.

WHEREFORE, Plaintiff Consolidated Electrical Distributors, Inc. claims of Defendant Hallmark Lighting, LLC and Defendant Resilience Capital Partners, LLC, and shall be awarded, such other and further relief as the Court may deem just and proper.

This, the 11th day of May, 2021.

/s/ Cody R. Loughridge
Cody R. Loughridge, NCSB 35417
Attorney for Plaintiff
Bailey & Dixon, LLP
PO Box 1351
Raleigh, NC 27602
Telephone: 919-828-0731
Facsimile: 919-828-6592
E-mail: cloughridge@bdixon.com

**VERIFICATION**

Wayne Carter, being duly sworn, states that he is the Carolina Division Manager for Consolidated Electrical Distributors, Inc., and is familiar with the facts from which this claim arises, that he has read the foregoing **COMPLAINT** in full, and that to his personal knowledge, information and belief, the matters and things stated therein are true, except as to such matters as are stated upon information and belief, and as to them, he is informed and believes that they are true.

_Wayne N. Carter_
Wayne Carter, Carolina Division Manager
Consolidated Electrical Distributors, Inc.

state: NC county: wake

Sworn to and subscribed before me this
The 27th day of April, 2021.

_Melissa R B_
NOTARY PUBLIC

Print Name: _Melissa R Berdonica_
My commission expires: _10-24-21_